In re HART SKI MFG. CO., INC., Debtor.

HART SKI MFG. CO., INC., Plaintiff,

v.

MASCHINEFABRIK HENNECKE, GmbH, a West German corporation, Defendant.

Bankruptcy No. 3–80–200.
Adv. No. 80–0165.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 1, 1982.

Robert S. Brill, Minneapolis, Minn., for Hart Ski Mfg. Co., Inc.

William M. Barron, New York City, for Maschinefabrik Hennecke, GmbH.

## MEMORANDUM DECISION AND ORDER

JOHN J. CONNELLY, Bankruptcy Judge.

The above-titled action came before the Court on a motion by defendant for an order dismissing the Complaint herein and staying all proceedings in this Court pending resolution of issues by arbitration under procedures established by the International Chamber of Commerce. The motion, and the relief for which it prays, is premised upon provisions of the United Nations Convention on the recognition and enforcement of foreign arbitral awards, 21 U.S.T. 2517, T.I.A.S. No. 6997 (Dec. 29, 1970) as implemented by Chapter 2 of the United States Arbitration Act, *Title 9 U.S.C. § 201 et seq.*

The motion has been submitted upon written briefs, and upon all of the file, record and proceedings, the following Memorandum Decision, incorporating Findings of Fact and Conclusions of Law, is made and entered, and is deemed to comply with form requirements of the Rules of Bankruptcy Procedure.

### I

Hart Ski Mfg. Co., Inc., the debtor and plaintiff in this action, filed a petition for reorganization pursuant to Title 11 U.S.C. § 701 et seq. (§ 301 et seq., Bankruptcy Code) on February 13, 1980. On June 9,

1980, the defendant, a West German corporation, filed a proof of claim in that proceeding as an unsecured creditor. This proof of claim is based upon an alleged balance due defendant for the purchase of polyurethane metering and mixing machines, presses and molds from defendant by plaintiff in 1977. On July 18, 1980, Hart served and filed a complaint objecting to the allowance of this claim, and interposing a counter-claim alleging breach of contract, breach of warranties, misrepresentation, and negligence upon which it seeks judgment for $13,000,000 in exemplary and compensatory damages. The motion sub judice was filed on October 28, 1980. The facts necessary to the determination of this motion can be stated rather briefly and augmented, where necessary, in the discussion of the issues.

Hennecke manufactures machines which mix polyol and isocyanate to produce polyurethane. Prior to 1977, Rossignol, a major European manufacturer of skiis, had utilized a machine produced by defendants to manufacture skiis with a polyurethane core. In July, 1977, Mr. Ruedi Unternacher, representing Hart Distribution AG, a Swiss company, contacted defendant and inquired about this utilization of one of defendant's machines. Shortly thereafter, Unternacher and Francois Wirtz, who at that time was employed by Rossignol but was to join Hart as a director of engineering within a short time, met with defendant's sales representative. After brief negotiation and investigation, Hart determined that it would purchase a machine, and, in August, Wirtz asked defendant to send an order confirmation for a HK–100 model metering and mixing machine. On September 12, 1977, this order confirmation was sent to Hart Distribution AG in Switzerland. The order confirmation specifies a price for the machine C.I.F. delivered St. Paul, Minnesota, USA, and states that the sale is made subject to certain general conditions which were printed on the form. Section VII.2 of the form provides that if the buyer is located outside of Germany, all disputes are to be conclusively decided by arbitration under the procedures of the International Chamber of Commerce, Paris. Section VII.1 provides that the place of performance for both parties is Birlinghoven, thereby designating German law to be applicable to the contract.

Thereafter, Wirtz developed a general concept for molds and presses into which the polyurethane would be injected to form skiis, and requested defendant to manufacture four molds, two presses, and some related equipment. On November 3, 1977, defendant sent Wirtz a telex message describing the equipment to be manufactured, the price, and related details. On November 4, 1977, defendant received a reply telex message from Roger Zaspel, "hart ski a s'tp" confirming the purchase. This telex includes the phrase "hk 100 complete as per confirming a–7201–135." The telex message was confirmed by a purchase order from Hart which is dated November 3, 1977. The total of the order was then confirmed by defendant by an order confirmation, dated December 6, 1977, on the same form which had been utilized to confirm the original order. The order was filled, and the HK–100 was delivered to Hart in Minnesota in early January and the molds, presses, etc. delivered in May, 1978. The proof of claim alleges that $174,680 of the purchase price remains unpaid.

Hennecke contends that the order confirmations contain all of the controlling terms and provisions of the contract between these parties, and that the dispute between them, and the issues raised in this case, must be submitted to arbitration under procedures established by the International Chamber of Commerce.

Plaintiff's initial position was quite unambiguously set forth in its memorandum in opposition to defendant's motion; viz:

"Hart does not dispute the language of the United Nation's Convention on the Recognition and Enforcement of Foreign Arbitral Awards; nor does Hart dispute the United States' accession to the Convention in 1970. Furthermore, Hart does not dispute that the Convention is enforceable in United States courts pursu-

ant to the United States Arbitration Act. It is also clear that the language of the purchase order provided for international arbitration. That is not in dispute.

With respect to Hennecke's argument that the filing of a petition in bankruptcy does not remove any obligation to arbitrate that existed prior thereto, is also not in dispute. Hart is in agreement with Hennecke that 'commencement of reorganization proceedings does not abrogate the duty to arbitrate.' "

Hart's original opposition to the motion was premised upon the contention that Hennecke is in default in proceeding to arbitration and has waived any right to resort to this provision of the contract.

Seven months after the matter was submitted, Hart shifted gears and submitted a memorandum in which it repudiates the statements that:

"It is also clear that the language of the purchase order provided for international arbitration. That is not in dispute."

Hart now contends that there never was an agreement to submit disputes to arbitration. Without any explanation of why this latter day conversion occurred, Hart reconstructs the transaction by a laborious analysis of the written documents, and concludes that the order from Hart to Hennecke dated November 3, 1977, comprises the contract, and that all else was prologue. Hart then resorts to a provision of Hart's purchase order which states:

"ENTIRE AGREEMENT—This contract contains the entire agreement of the parties. It may not be modified or terminated orally, and no claimed modification, termination or waiver shall be binding on buyer unless in writing signed by a duly authorized representative of buyer. No modification or waiver shall be deemed affected by seller's acknowledgment or confirmation containing other or different terms and such other or different terms shall not become a part of this agreement."

Hart contends that this provision is an express repudiation of all provisions, terms and conditions contained in Hennecke's order confirmation, including the arbitration clause.

For several reasons, the Court is not persuaded.

■ First, this Court cannot agree with the proposition that Hennecke's order confirmation of September 19, 1977, was merely an offer. The offer to sell and the acceptance had been made verbally in August, and this instrument confirmed the contract, reduced it to writing, and established its terms and conditions insofar as the HK–100 machine itself was concerned.

Thereafter the parties discussed and negotiated for the purchase of molds, presses, etc. to use with the machine to manufacture the skiis. These were essential to Hart's use of the machine and had to be purchased somewhere. By telex Hennecke established a firm price for these items designed "as discussed in our company." This may have been an offer, but by telex Hart stated "please find below p.o. 3310 (which will follow by mail) confirming Mr. Wirtz and Mr. Bjork's purchase." The plain import of this statement is that the purchase agreement had already been consummated and that the purchase order would merely be written confirmation. This telex then concludes:

"hk 100 complete as per confirming a–7201–135."

This phrase was used again in the Hart purchase order. Why? What is the import of this phrase? Hart contends that it refers only to the machine with all of the ancillary equipment and features listed on the original order confirmation and does not pertain to the molds, presses, etc. However, Hart offers no explanation of why, if this is so, it was felt necessary or advisable to make note of that transaction on two separate subsequent documents. If one bears in mind that the apparatus was of little value to Hart unless it would both manufacture polyurethane and then compress and shape that polyurethane into a ski, a more reasonable interpretation and explanation of the inclusion of this phrase is apparent. Hart had decided to purchase the necessary

equipment for both stages of the operation from one manufacturer. This language was most likely inserted to assure that the machine and all ancillary equipment purchased from Hennecke would be complete and would include everything necessary to perform the entire operation and function for which the apparatus was purchased. In asserting or affirming that the entire purchase was pursuant to the provisions of the original confirming order Hart incorporated all provisions of the original order confirmation into the total purchase contract for the machine, ancillary molds, presses, etc. At this point, a contract to purchase had been consummated and part of it reduced to the writing contained in the documents. What occurred later was epilogue. The purchase order issued by Hart could not, and did not, alter, amend or supplement the purchase contract. At most it translated some of the written portions into English and the purchase price into dollars. Likewise, the final order confirmation delivered to Hart by Hennecke adds nothing. This document merely records both transactions on one document, without design specifications which remained unwritten.

■ Secondly, the Court cannot remain oblivious to the interpretation of the agreement between the parties which Hart, itself, placed upon it from its inception to July of 1981. During that period of time, Hart conceded that it was bound to arbitrate disputes arising out of the contract in accordance with the provision of the confirming order. A contract presupposes a meeting of minds. Insofar as the clause in question is concerned, Hart by its conduct, and explicit representations to the Court, evidenced a meeting of the minds. Only after this litigation was a year old, and the effect of the clause fully aired, did Hart in any way attempt to cast doubt upon this mutuality. One need exercise only a modicum of imagination to identify the source of this inversion. One would be obtuse not to recognize in this divergence the hand of skilled, adroit and innovative counsel. A court would be remiss, however, in allowing an ingenious advocate to persuade it that something which a party admits he agreed to is not what he agreed to at all. Counsel's contention as to what Hart agreed is not nearly as persuasive as Hart's admission as to what it agreed for a period of several years prior to counsels' brainstorm.

■ In applying the federal law under the Arbitration Act, the Court must focus on the single question of whether or not there was agreement on the clause in the contract providing for arbitration. *Avila Group, Inc. v. Norma J. of California, 426 F.Supp. 537 (1977); Bigge Crane & Rigging Co. v. Docutel Corp., 371 F.Supp. 240 (N.Y. 1973)*. The chronology of the documents which Hennecke submitted and Hart accepted, and Hart's demonstration of its understanding of those documents, are sufficient to establish an agreement to arbitrate. This Court specifically finds that the contract between these parties provides for arbitration of disputes arising out of the contract.

## II

■ Hart concedes that, if the contract provides for arbitration of disputes, the parties are bound by the United Nations Convention and that the convention is enforceable in this Court in accordance with provisions of the United States Arbitration Act. Article II(3) of the convention provides that:

> "The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."

Title 9 U.S.C. § 201 provides that the convention shall be enforced in United States courts in accordance with Chapter 2 of that title. Section 208 of Chapter 2 makes the provisions of Chapter 1, the body of the United States Arbitration Act, applicable to actions and proceedings brought under Chapter 2, where not in conflict with Chapter 2 or the convention. Hart's second basis

for opposition to the stay of proceedings in this Court is premised upon the proviso contained in Title 9 U.S.C. § 3, which provides:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, *providing the application for the stay is not in default in proceeding with such arbitration.*" [Italics added]

In many instances where a court has been concerned with the unconscious extinguishment of a right, the terms default and waiver are used interchangeably. This may be technically semantically inaccurate. Actually, in the context with which we are concerned, a default results in a waiver. Whether or not a technical default is of sufficient magnitude to constitute a waiver is a question for the Court. *N & D Fashions, Inc. v. DHJ Industries, Inc., 548 F.2d 722 (8th Cir. 1977).* Pure waiver, which connotes laches or estoppel, is generally an issue for the arbitrator to determine. In this case, therefore, we must look to the conduct of the defendant evidencing default to determine whether or not this conduct has been adverse or inconsistent with defendant's present claim to a right to arbitrate to the extent that it constitutes a waiver of that right.

■ Hart claims that the most important fact bearing upon the determinative issue is Hennecke's initial choice of this forum. This choice, Hart claims, was made by Hennecke filing a proof of claim in the reorganization proceedings. Hart views this as tantamount to the commencement of an action in this Court. The Court cannot agree. The filing of a proof of claim under the Bankruptcy Code was purely a ministerial or administrative act. Judicial consideration of the claim occurred only in respect to its allowance, sua sponte, or upon an objection being filed in accordance with provisions of Rule 306, *Rules of Bankruptcy Procedure.* In a Chapter XI proceeding claims included all unsecured debts, demands or claims of every character, provable or not, regardless of whether or not they were liquidated or unliquidated, fixed or contingent. *Sec. 307(2) Bankruptcy Code.* Creditors were obligated to file proofs of claim in order to participate in the distribution provided by a confirmed plan. *See, §§ 355 and 369, Bankruptcy Code.* Upon confirmation of an arrangement its provisions became binding upon all creditors regardless of whether or not a particular creditor had filed a proof of claim or that claim had been scheduled and allowed, and the debtor was discharged from all unsecured debts and liabilities provided for by the plan, with two stated exceptions. *§§ 367 and 371, Bankruptcy Code.* Filing the proof of claim did not invoke the judicial function of the Court. It invoked the administrative function of the Court which was necessary to preserve Hennecke's right to participate in the plan as an unsecured creditor. The judicial power of this Court was invoked by Hart when it filed the Complaint under Part VII, *Rules of Bankruptcy Procedure,* objecting to the claim and asserting a counter-claim which it assumed was cognizable under the broad jurisdiction grant of Title 28 U.S.C. § 1471. In a strict sense, Hennecke did not commence an action in this Court. It merely acted to protect and preserve rights in this Court by an administrative act mandated by the Bankruptcy Code.

The soundness of a position can often be tested by looking to the affect of the adoption of a contra position. If one accepts Hart's contention at face value, one need only contemplate for a moment the classic Catch 22 in which Hennecke would have been immeshed had Hart proposed a plan which would pay Hennecke only a nominal amount. This Court cannot find default constituting a waiver in Hennecke's coerced participation in this Chapter XI proceeding.

■■ Neither can this Court find that defendant was dilatory in asserting its right to arbitration. The time lapse from the date that the proof of claim was filed to the date that Hart's action was filed was about 40 days. This motion was filed within 70 or so days thereafter. A greater degree of diligence could hardly be expected. Prior to Hart filing the objection to the claim, a wait-and-see approach is understandable. A satisfactory recovery under a confirmed plan was within the realm of possibility, and, until Hart objected to defendant's claim, a dispute over the amount of the balance due Hennecke upon which the parties were stalemated does not surface in this record, so there was nothing to arbitrate. Be that as it may, mere lapse of time is not, in and of itself, default under the Arbitration Act. *See, Almacenes Ferdandez, S.A. v. Golodetz, C.C., 148 F.2d 625 (2nd Cir. 1945); Carcich v. Rederi A/B Nordie, 389 F.2d 692 (2nd Cir. 1968); Halcon International, Inc. v. Monsanto Australia Ltd., 446 F.2d 156 (7th Cir. 1970) cert. den. 404 U.S. 949, 92 S.Ct. 286, 30 L.Ed.2d 266 (1971); Harris Hub Bed & Spring Co. v. United Elec. Radio & Machine Workers, 121 F.Supp. 40 (Pa.1954); China Union Lines v. American Marine Underwriters, 458 F. Supp. 132 (N.Y.1978); see, also, N & D Fashions, Inc. v. DHJ Industries, Inc., supra.*

■■ The determinative fact in considering whether or not there has been a default constituting a waiver is the prejudicial effect of the moving party's conduct on the non-moving party. *China Union Lines, Ltd. v. American Marine Underwriters, Inc., supra; Carolina Throwing Co. v. S & E Novelty Corp., 442 F.2d 329 (4th Cir. 1971); Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co., Inc., 572 F.2d 1328 (9th Cir. 1978).* The party seeking to avoid arbitration under the proviso of Section 3 of Title 9 must demonstrate prejudice. Hart's averments of prejudice are largely related to the effect recourse to arbitration will have on a successful reorganization, and the expense involved in the arbitration process. These appear to this Court to be quite immaterial. Naturally there will be some disadvantage to Hart in proceeding to arbitration at a European site vis-a-vis litigating on its home field in St. Paul, Minnesota. However, this disadvantage does not flow from, nor was it aggravated by, any post-contract activity of the defendant. It arises by virtue of the contract, and would exist regardless of when Hennecke asserted its right to arbitration under that contract. This disadvantage is not one which directly bears upon Hart's legal rights, or its posture in this dispute, or the issues involved, to the extent that it militates against a just disposition of those issues. Prejudice, in the legal sense, has not been established.

The Court specifically finds that Hennecke is not in default in proceeding with such arbitration and does not find that the agreement to arbitrate is null and void, inoperative or incapable of being performed.

III

■ Finally, this Court must view this case in the light of the law as it exists at this time. This Court is persuaded by the teaching of *Marathon Pipeline Company v. Northern Pipeline Construction Co., 12 B.R. 946, 5 CBC 2d 114, (D.C.Minn.1981) (Lord, J.),* that subject matter jurisdiction of the issues raised by plaintiff's counter-claim is not reposed in this Court. Granting defendant's motion to merely stay proceedings on that counterclaim, therefore, is a gesture without meaning. Neither Court nor counsel can proceed. The only issue of which this Court has jurisdiction is the amount of Hennecke's allowable claim in the reorganization proceeding. This claim appears to be inextricably bound to the issues raised by the counter-claim. For economy, if for no other reason, all issues should be determined by one tribunal, and that is somewhere other than this Bankruptcy Court.

IV

■ The policy underlying the Arbitration Act is that agreements are to be construed liberally in favor of arbitration. *Lundgren v. Freeman, 307 F.2d 104 (10th Cir. 1962); JS & H Const. Co. v. Richmond County Hospital Authority, 473 F.2d 212 (5th Cir. 1973).* The purpose of Chapter 2

of Title 9 U.S.C. is to encourage arbitration disputes arising out of transactions by American businessmen in foreign countries. *Island Territory of Curacao v. Solitron Devices, Inc., 356 F.Supp. 1 (N.Y.1973) aff'd. 489 F.2d 1313 (2nd Cir. 1973), cert. den. 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974).* Federal law and federal policy unequivocally support the enforcement of private arbitration agreements entered into by citizens of the United States and foreign nationals. *Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). (See, Quigly, excession by the United States to the United Nations Convention on the recognition and enforcement of foreign arbitral awards, 70 Yale L.J. 1049 (1961).)*

Wherefore, it is—

ORDERED:

1) That defendant's motion shall be, and hereby is, granted.

2) That the counter-claim interposed by plaintiff shall be, and hereby is, dismissed, without prejudice.

3) That the parties shall resort to arbitration of their dispute under procedures established by the International Chamber of Commerce.